**Continuation of Application For Search Warrant**

1. I, Timothy L. Lessner, am a Special Agent with the Drug Enforcement Administration (DEA) assigned to the Traverse City, Michigan Post of Duty. I have been employed by the DEA since 2004, and I have been assigned as a member of the Michigan State Police Traverse Narcotics Team (TNT) since 2019. As part of my duties as a DEA Agent, I routinely investigate violations of federal law involving controlled substances, including violations of 21 U.S.C. §§ 841, 846. I also have received training in investigating these areas, and I routinely work with other officers and agents who investigate these areas.

2. As a federal agent, I am authorized to investigate violations of laws of the United States. I am also a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.

3. I make this Continuation in support of an application for a search warrant for a cellular telephone (Target Device) that is described more fully in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B. The Target Device was seized from the KATHERINE ANN RAPHAEL on July 23, 2020, incident to her arrest as described below. The arrest took place in the Western District of Michigan, and the Target Device has remained, and currently is, in the possession of law enforcement in this District. The Target Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of law enforcement.

4. The statements in this Continuation are based on my personal observations; my training and experience; my review of relevant records related to this investigation; and information obtained from other agents, officers, analysts, and witnesses, including information

obtained from TNT and Grand Traverse Band (GTB) Tribal Police.  This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### General Background

5.      In or about the Summer of 2019, Witness 1 spoke with Grand Traverse Band (GTB) Tribal Police.  During one conversation, Witness 1 mentioned that his girlfriend (Witness 2) might be willing to assist police with narcotics investigations.  Police subsequently spoke with Witness 2, who agreed to assist police with narcotics investigations.[1]

6.      On August 14, 2019, Witness 2 assisted the Traverse Narcotics Team (which includes DEA) in making a controlled buy of cocaine.  Specifically, Witness 2 made a controlled buy of cocaine from Melvin James HARRIS (aka "Doo"), using $100 of prerecorded TNT funds.  HARRIS chose the location for the sale – a spot within the GTB community, commonly known as Peshawbestown.

7.      On August 18, 2019, HARRIS was arrested on a number of outstanding warrants.  He resisted the officer who attempted to arrest him but was ultimately detained.  At the time of his arrest, HARRIS was in possession of $80 of the prerecorded TNT funds that Witness 2 had used in the controlled buy.

8.      HARRIS was charged in this District with Distribution of Cocaine and Assaulting a Federal Officer (19-CR-209 (JTN)).  He then violated a Protective Order, conspired with others to tamper with Witness 2, and took steps to put that conspiracy into action.  In January 2020, the grand jury returned a third superseding indictment (19-CR-209 (JTN)) charging HARRIS with

---

[1] The full identity of both Witness 1 and Witness 2 are known to me.  I have referred to them in this fashion given the history of witness tampering and threats.  Witness 1 has a prior conviction for Criminal Sexual Conduct, 1st Deg (Person Under 13).

Distribution of a Controlled Substance, Assaulting/Resisting a Federal Officer, Contempt of Court, Conspiracy to Witness Tamper, and Witness Tampering. HARRIS' sister (Vanessa HUNTER) and HARRIS' cousin (Corey RAPHAEL) were also charged with Conspiracy to Witness Tamper and Witness Tampering.

9. The case against HARRIS and HUNTER proceeded to trial before Judge Neff last week, starting on July 13 and ending on July 16. The government presented evidence about the controlled buy and the recovery of $80 of prerecorded funds from HARRIS' person. Witness 2 testified against HARRIS during the trial, and information about Witness 1's role in connecting police with Witness 2 was also elicited. HARRIS was convicted on all counts, and HUNTER was convicted of conspiracy to witness tamper.

### Threats

10. On July 23, 2020, at approximately 11:29 a.m., Witness 1 received an incoming Facebook messenger message from Facebook user Katherine Ann RAPHAEL. The message stated, "Pussy ass trying to take my cuzzin down cause he loves ur baby momma that is a piece of shit momma..anyway..you and ur ugly ass girlfriend....pathetic person you are..he is not going down over 80.00 bucks..then you will be always be looking behind your back..this is not a threat..its a promise..go ahead and take it to tribal police with ur pussy ass.. Down syndrome looking fas [sic] ass.." Witness 1 replied, ""who are you talking about with your weird ass old mast dried up funny look burnt out tossed up bitch?" RAPHAEL replied, "You." Witness 1 replied, "lk. What person you talkin about dumb bitch?" RAPHAEL replied, "Your words will not affect me.." Witness 1 stated, "I don't know what your talkin about. Miss me with your regarded nonsense pill head. Retarded*" RAPHAEL replied, "I will show you this dumb bitch what i am capable of..bring it. I am legal to carry a 9mm…no felon here." Witness 1 replied,

3

"Why do I care if you carry a gun dumb ass weirdo?"  RAPHAEL replied, "To protect my family from the like of you.."  Witness 1 replied, "I've never done anything to you.  Or your fam.  Plz don't hurt me."  RAPHAEL replied, "A preditor in our community..  No don't you hurt anyone in our community.."  Witness 1 replied, "I'm not dummy.  Are you drunk?"  RAPHAEL replied, "Done said by bizzness..bye..  Been sober 30 years.."  Witness 1 asked, "So you threatening me?"  RAPHAEL stated, "If you come to my property or near my family..you bet your ass i am..take to the police..cause they know my stance on ur kind.."  Witness 1 replied, "I though you was threatening me over your fag ass cousin."  RAPHAEL replied, "Nope .. cause you are a threat to our community."

11. Witness 2 reported this information to law enforcement shortly after the exchange of messages.  Witness 2 viewed these communications as a threat and was afraid.  Witness 1 forwarded some of the screen shots of the exchange to law enforcement.

12. At approximately 1:49 p.m., law enforcement officers interviewed Witness 1.  Law enforcement viewed the cellular phone of Witness 1 and observed the Facebook Messenger exchange between RAPHAEL and Witness 1.  Law enforcement obtained screenshots of the communications from Witness 1.  These screenshots show that the communications were with "Katherine Anne Raphael" (see below), and Witness 1 said they were from her.  As one can see, a profile picture of "Katherine Anne Raphael" is visible in the screenshot.



13.     I conducted a public search of "Katherine Raphael" on Facebook.  I found a Facebook profile that matched the above profile image (see below).   The account is: https://www.facebook.com/katherine.raphael .



14.     At approximately 2:53 p.m., your Affiant along with GTB Tribal Law Enforcement went and interviewed RAPHAEL at her home, which is at [address redacted], which is on the GTB Reservation in Peshawebestown, Michigan.  Your Affiant and the GTB Tribal Law Enforcement Officer made contact with RAPHAEL, who was exiting the house as Law Enforcement exited the marked patrol vehicle.  Also present from portions of the interview was Morgan Raphael, who the Law Enforcement Officer knew from previous interactions.   During this interview, RAPHAEL

5

ultimately admitted to sending the Facebook Messages to Witness 1.

15. Law enforcement told RAPHAEL they were there to talk about threats on social media. RAPHAEL said, "On Messenger. He [Witness 1] was threatening her. I'm going to protect my cubs" and RAPHAEL pointed to Morgan Raphael, who was sitting nearby. Law enforcement asked when the alleged threats from Witness 1 came in, and RAPHAEL stated, "They've been coming in for months. We started talking to [Witness 1] a long time ago." She said Witness 1 was posting items on Facebook about Morgan Raphael.

16. Referring to the messages RAPHAEL sent to Witness 1, a detective, who had known RAPHAEL for a long time, noted that it was uncharacteristic to see a violent side in her. She responded, "Well, when it involves my cubs." RAPHAEL stated she didn't know who law enforcement was talking about (i.e., Witness 1), and the detective responded, "[Witness 1's first name]." RAPHAEL responded, "I don't know him." The detective stated, yes you do, and RAPHAEL said, "I've never met him."

17. Referring to the messages described above, RAPHAEL asked/stated, "So what, stop threatening? I'm done, I've blocked him." An agent stated, "I think you can understand why we're out here. Based on the trial, whether you agree... " RAPHAEL interrupted and stated, "The trial is over, so I can't be involved in that no more. I knew that, that was my right. Once the trial was over, I can't be indicted for what...tampering? Witness tampering?" RAPHAEL stated she was not present for the trial and she didn't get the news until she got back. RAPHAEL stated "I think the courts failed to understand that our tribe has threatened these people into speaking against him...over 80 dollars. Because [Witness 1] is mad because his baby momma loves my cousin." A detective asked which cousin she was referring to, and RAPHAEL said "Melvin Harris." During the interview, RAPHAEL stated "I'm mad about the situation about Doo. I am."

6

18. During the interview, RAPHAEL stated "I lied. I don't have a 9mm yet, but I'm going to get one soon."

19. A GTB Law Enforcement Officer viewed the sent messages on RAPHAEL's phone. Furthermore, RAPHAEL sent screenshots from RAPHAEL's phone to the GTB Law Enforcement Officer's phone, which the officer confirmed with RAPHAEL that he had received them. (Note: these messages are consistent with those provided by Witness 1.) RAPHAEL provided law enforcement with her telephone number [redacted] prior to law enforcement leaving the residence. At approximately 3:36 p.m., law enforcement left the residence.

20. At approximately 4:25 p.m., Uniformed Officers from the GTB Tribal Law Enforcement were en route to RAPHAEL's residence to arrest RAPHAEL. The GTB Tribal Law Enforcement Officer observed a vehicle previously seen at the residence pulling a trailer while the vehicle was traveling eastbound on East Kitigan Mi Kun. GTB Tribal Law Enforcement activated their overhead emergency lights and the vehicle stopped. While speaking with RAPHAEL, who was the passenger in the vehicle, GTB Tribal Law Enforcement told RAPHAEL that she was under arrest and they would also seize her telephone. Prior to being handcuffed, RAPHAEL leaned into the vehicle and threw her purse to Morgan Raphael, who was in the driver's seat. RAPHAEL stated, in sum or substance, don't give them my phone. Morgan Raphael told RAPHAEL that if she didn't turn over the phone, she would be arrested for withholding evidence. Shortly thereafter, Morgan Raphael unzipped the purse and handed the officers RAPHAEL'S telephone, which was turned over to TNT detectives for safekeeping until a warrant could be obtained. RAPHAEL was transported to the Grand Traverse County Jail for processing and overnight holding pending her transport to the USMS.

21. Witness 1 was in the Western District of Michigan at the time he received the above

messages.

22. Based on my training and experience, it is my understanding that Facebook Messenger operates via the Internet, which is a means and facility of interstate commerce.

**Background Concerning Facebook Messenger**

23. Facebook Messenger (commonly known as Messenger) is a messaging app and platform that is commonly used on cellular telephones and tablets (it can also be used on computers). Messenger supports audio and video calls from both the mobile app, the desktop Messenger website, and the Facebook site. The app's phone icon is for audio calls, while the camera icon makes face-to-face video calls. A user can use Messenger to make free voice calls. The recipient also needs to be using either the Messenger app or the Facebook app, and will need to have his/her device connected to the internet. The recipient can also receive calls using the Facebook website. Users can access both the Messenger App and the Facebook website via their mobile phones. Users of Messenger can also exchange messages, or chats, with other Messenger users. Users can sent text, photos, videos, and voice messages using this platform. Users can choose to encrypt such messages, but that feature is an "opt-in" feature that must be selected by the user. (*See* https://www.facebook.com/help/messenger-app (visited 12/3/2019).)

**Relevant Messages**

24. I know from my training and experience that copies of Facebook Messenger communications can be recovered from a person's cellphone, if the cellphone was used to send or receive the message via Messenger. There is, therefore, probable cause to believe that copies of the Messenger communications discussed above will be found on the Target Device.

25. As noted above, RAPHAEL claimed that Witness 1 has been issuing threats on Messenger for months. Based on the investigation in this case, there is reason to believe

RAPHAEL was communicating with Witness 1 with the Target device. There is therefore probable cause to search the Target device to see whether or not there is any evidence of these alleged threats. RAPHAEL also made seemingly inconsistent statements about the nature and duration of her relationship with or knowledge of Witness 1. Based on my training and experience, I know that evidence probative of the nature and duration of relationships are often found on cellular telephones. There is therefore cause to search for evidence about the nature and extent of the relationship between the two.

26.    As noted above, RAPHAEL referenced specific facts regarding HARRIS' case in her initial threatening communication. RAPHAEL stated she was not at HARRIS' trial and learned of it later. I know from my training and experience that cellular telephones and social media are commonly used to communicate such information. I also know from the underlying investigation of the HARRIS case that cellular telephones and Messenger were used frequently to disseminate information about Witness 2 and her involvement in the HARRIS case, in order to commit the crimes discussed above. Based on my investigation in that matter (and the investigation of other similar matters), I know that there were usually preliminary discussions about planned efforts to tamper with or harass witnesses and/or to disseminate information about witnesses. There is therefore cause to search the Target Device for communications that bear on RAPHAEL's purpose, motive, knowledge, and intent, as it relates to the threatening messages she sent in this case.

27.    In the threatening messages discussed above, RAPHAEL mentioned that she was "legal to carry a 9mm." She then told police she did not have a 9mm, but planned on getting one soon. In my training and experience, people who possess firearms for illicit purposes often maintain photographs of such weapons on their cellular telephones and/or social media account,

9

and often discuss them using social media or text messages. In addition, cellular telephones can be used to search for such weapons, and I am aware that forensic analysis of such phones can reveal evidence of such searches, including in browsing history, chats, etc.

### Evidence of Identity and Timeline

28. Based on my training and experience and the training and experience of other law enforcement officers, I submit that there is probable cause to believe that a search of the Target Device will yield evidence probative of the identity of the person who possessed the Target Device on the dates discussed above. Based on my training and experience, I know that cellular telephones such as the Target Device almost always contain some evidence probative of ownership/possession. This evidence includes, but is not limited to, the owner/possessor's name and/or telephone number; photographs of the owner/possessor, his property, residence, weapons, and/or associates; emails, text messages, or SMS messages containing the name, nickname, photographs, or other information indicative of the owner/possessor's identity; call records showing the persons with whom the owner/possessor communicated; and internet history showing access to email or social media accounts that would tend to identify the owner/possessor.

29. Based on my training and experience, I know that cellular telephones usually contain historical information concerning call activity; any information stored in the phone's "phonebook" or "contacts" directory; stored voice-mails; emails; text messages; and electronic files; photographs; video images; and records of internet searches and transactions. This information is of value in not only identifying the person who used/possessed the phone, but also in identifying and locating witnesses and/or criminal associates. It is also valuable in establishing a timeline surrounding the events described above, because a person's cellphone often contains evidence (e.g., timestamped calls, messages, photos, etc.) of a person's activities and whereabouts

at a given time. Such evidence from the Target Device will therefore be relevant to the facts at issue in this case.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. Forensic *evidence.* As further described in Attachment B, this application seeks permission to locate forensic electronic evidence that establishes how the Target Device was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

33. Nature *of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

11

parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### REQUEST FOR AUTHORIZATION TO UNLOCK DEVICES

35. Based on my knowledge and experience, and information provided to me by others, I know that certain cellular telephones, including phones such as the Target Device, may be locked and/or unlocked by personal identification numbers (PIN), gestures or motions, and/or with biometric features, such as thumb and fingerprint recognition (collectively, "fingerprint ID") and/or facial recognition ("facial ID").

36. If a user enables the fingerprint ID unlock feature on a device, he or she can register several fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor, which typically is found on the front of the device. In my training and experience, users of devices that offer fingerprint ID or facial ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

37. In some circumstances, a fingerprint or face cannot be used to unlock a device, and a passcode or password must be used instead. Depending on the configuration of the security

settings on the phone, the opportunity to unlock the device via fingerprint ID or facial ID exists only for a short time. Fingerprint ID and facial ID also may not unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) several unsuccessful attempts to unlock the device are made.

38. The passcode or password that would unlock the device(s) is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) or present the face of the user(s) of the device(s) found during the search to the device's fingerprint ID or facial ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint ID or facial ID is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

39. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s), this will result in the device requiring the entry of a password or passcode before it can be unlocked.

40. Based on the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Katherine RAPHAEL to the fingerprint ID sensor or to present his face to the facial ID sensor of any seized device(s) to attempt to unlock the device in order to search the contents as authorized by this warrant.